# UNITED STATES DISTRICT COURT

for the
Western District of Washington

In the Matter of the Search of
*(Briefly describe the property to be searched*
*or identify the person by name and address)*
SUBJECT ACCOUNT:
Google Email Account: dwighthenline44@gmail.com

)
)
)
)
)
)

Case No.    MJ22-267

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. § 844(i) | Arson |

The application is based on these facts:

✓ See Affidavit of , continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

---

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

NATALIA VOROTNIKOVA    Digitally signed by NATALIA VOROTNIKOVA
Date: 2022.06.15 13:34:03 -07'00'

*Applicant's signature*

Special Agent Natalia Vorotnikova, ATF
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:    June 16, 2022

*Judge's signature*

City and state:    Seattle, Washington

Hon. Brian A. Tsuchida, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

STATE OF WASHINGTON       )

                              )      ss

COUNTY OF KING             )

I, Natalia Vorotnikova, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, in Seattle, Washington, having been duly sworn, state as follows:

## AFFIANT BACKGROUND AND INTRODUCTION

1. I am a Special Agent with the United States Department of Justice (DOJ), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been so employed since March 8, 2018. I am currently assigned to the Seattle Field Division in Seattle, Washington, where I am assigned to the Seattle III Field Office. The Seattle III Field Office is mainly responsible for investigating arson- and explosives-related incidents. I also enforce federal criminal laws relating to the unlawful possession, use, and trafficking of firearms, and investigate individuals who illegally use firearms to commit violent crimes. I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Title 18, United states Code, Section 2516.

2. I received formal training at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. I successfully completed the Criminal Investigators Training Program (CITP), which familiarized me with basic narcotic investigations, drug identification, drug detection, familiarization with United States narcotics laws, financial investigations, money laundering, identification and seizure of drug-related assets, organized crime investigations, physical and electronic surveillance and undercover operations. In addition, I successfully completed a fourteen-week, ATF Special Agent

AFFIDAVIT OF SA VOROTNIKOVA - 1
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Basic Training (SABT) course in Glynco, Georgia. SABT included comprehensive,

2  formalized instruction in, amongst other things: firearms identification, firearms

3  trafficking, arson investigations, explosives identification and investigation along with

4  alcohol and tobacco diversion. I have a Bachelor of Science Degree in Criminal Justice

5  from Winona State University in Winona, Minnesota.

6        3.     As noted above, I am responsible for investigations involving specified

7  unlawful activities, to include violent crimes involving firearms and arsons that occur in

8  the Western District of Washington. I am also responsible for enforcing federal firearms

9  and explosives laws and related statutes in the Western District of Washington. I received

10  training on the proper investigative techniques for these violations, including the

11  identification of firearms and the location of the firearms' manufacture. I have actively

12  participated in investigations of criminal activity, including but not limited to crimes

13  against persons, crimes against property, narcotics-related crimes, and crimes involving

14  the possession and use, theft, or transfer of firearms, and arson investigations. During

15  these investigations, I have also participated in the execution of search warrants and the

16  seizure of evidence indicating the commission of criminal violations.

17        4.     I make this affidavit in support of an application for a search warrant for

18  data and information associated with an account ("Target Account") stored at premises

19  controlled by an electronic communications service and/or remote computer service

20  provider ("Provider"), referenced below.  The information to be searched is described in

21  the following paragraphs and in Attachment A, which is incorporated herein.  This

22  affidavit is made in support of an application for a search warrant under 18 U.S.C.

23  §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require:

24        a.     Google LLC ("Google" or "Provider"), located at 1600

25  Amphitheatre Parkway, Mountain View, California, to disclose to the government copies

26  of the information, including the content of communications, further described in

27  Section I of Attachment B, pertaining to the account associated with the following,

28  identified in Attachment A: **dwighthenline44@gmail.com**.

AFFIDAVIT OF SA VOROTNIKOVA - 2
USAO# 2022R00471

1  Upon receipt of the information described in Section I of Attachment B, government-
2  authorized persons will review that information to locate the items described in Section II
3  of Attachment B.  This warrant is requested in connection with an ongoing investigation
4  in this district by the Seattle Field Office of the ATF.

5        5.      As set forth below, the Target Account is believed to be used by DWIGHT
6  C. HENLINE, who has engaged in arson.  On about May 18, 2022, a Grand Jury in the
7  Western District of Washington issued an Indictment charging DWIGHT C. HENLINE
8  with Arson in violation of Title 18, United States Code, Section 844(i).

9        6.      The facts set forth in this Affidavit are based on my personal knowledge;
10  information obtained from other individuals during my participation in this investigation,
11  including other law enforcement officers; review of documents and records related to this
12  investigation; communications with others who have personal knowledge of the events
13  and circumstances described herein; and information gained through my training and
14  experience. Because this Affidavit is submitted for the limited purpose of establishing
15  probable cause in support of a criminal complaint, it does not set forth every fact that I
16  and others have learned during this investigation.

17       7.      Based on my training and experience and the facts as set forth in this
18  affidavit, there is probable cause to believe that violations of Title 18, United States
19  Code, Section 844(i) (Arson), ("Target Offense"), has been committed by DWIGHT C.
20  HENLINE.  There is also probable cause to search the information described in
21  Attachment A for evidence, instrumentalities, and fruits of these crimes further described
22  in Attachment B.

23                    **SUMMARY OF PROBABLE CAUSE**
24                              *The Fire*

25       8.      On Thursday, April 7, 2022, at approximately 3:43 a.m., the San Juan
26  County Sheriff's Office (SJCSO) dispatch received a call from a citizen who reported he
27  observed flames emanating from the rear of the Crystal Seas Kayaking building located
28  at 40 Spring Street, Friday Harbor, Washington. San Juan County Fire Department units

arrived to fight the fire, including elements from Orcas and Lopez Island Fire Departments. Fire units continued to fight the fire until approximately mid-day, April 7, 2022. The fire spread to the adjacent buildings located southwest of Crystal Seas Kayaking, which housed the businesses Windermere Real Estate, Crow's Nest Coffee, and Herb's Tavern, resulting in severe damage to or total destruction of those businesses. Cost estimates are ongoing, but are projected to be in the millions of dollars. San Juan County requested assistance from ATF to investigate the cause and origin of the fire.

9.      From April 9, 2022, through April 13, 2022, subject matter experts from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) National Response Team (NRT) processed the scene to determine the origin and cause of the fire. The team included certified fire investigators, certified explosive specialists, electrical engineers, fire protection engineers, and other specialists. The scientific method was followed during the course of the scene investigation. As investigators collected and analyzed data, numerous hypotheses were developed and considered. Investigators considered all reasonable causes/ignition hypotheses that were supported by evidence, including accidental, natural, and willful action. Personnel interviewed witnesses, assessed fire patterns, and analyzed fire dynamics relevant to the scene.

10.      Investigators located and recovered video from a Nest Security System in the Windermere Real Estate Office. Windermere is housed at 50 Spring Street, immediately adjacent to Crystal Seas Kayaking. One of the cameras inside Windermere was set in a rear conference room, pointing towards the back of the building. The windows in that conference room were adjacent to and looked out at the rear wooden deck area of the Crystal Seas Kayaking building. However, on the evening of April 6, 2020, the shades to those windows were closed.

11.      Although the shades were closed, the video captured a bright flash of light at approximately 10:04 p.m. on April 6, 2022 (*Figure 1*). The flash of light lasted for approximately 34 seconds and then began to flicker and diminish in brightness. The audio also captured a crackling sound.

AFFIDAVIT OF SA VOROTNIKOVA - 4
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



*Figure 1*

12.     At approximately 3:15 a.m. on April 7, 2022, the Windermere Real Estate Office's Nest Security System began capturing a glow through the windows and the glass door of the conference room. The glow continued to intensify.

13.     At approximately 03:38 a.m., a glow consistent with fire and what appeared to be white smoke were observed outside the windows and the glass door (*Figure 2*). The camera subsequently went offline.

//

//

AFFIDAVIT OF SA VOROTNIKOVA - 5
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



*Figure 2*

14.     Investigators excavated and sifted the rear portion of the building and deck area behind Crystal Seas Kayaking. Investigators examined the electrical system and components within the same area and eliminated them as a potential cause of the fire. Investigators considered potential accidental fire causes and tested them against the available data, subsequently eliminating them as a cause of the fire.

15.     Based upon witness statements, fire patterns, and fire dynamics, including an analysis of CCTV video, it is the combined opinion of the subject matter experts from the ATF National Response Team that the fire originated on the lower rear wooden deck behind Crystal Seas Kayaking. The cause of the fire was an ignitable liquid being introduced into the fire scene and ignited. After an ignitable liquid is ignited, the fire grows rapidly in intensity, producing bright light. As the ignitable liquid is consumed, the fire and the light it produces diminish. When there are other fuels—like a wooden deck—the fire may smolder for some time before again increasing in intensity as these other fuels are consumed. ATF experts have observed similar fire dynamics in laboratory settings where ignitable liquids were used.

AFFIDAVIT OF SA VOROTNIKOVA - 6
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

16.     Due to analysis of the previously stated data, ATF has classified the fire as incendiary. In this context, incendiary means that the fire did not have an accidental or natural cause. Instead, it was intentionally started.

### *Identification of DWIGHT C. HENLINE as Being in the Vicinity of the Fire When It Began*

17.     During their investigation, ATF Special Agents and SJCSO personnel collected video from several businesses and government agencies in the vicinity of 40 Spring Street. Analysis of selected video feeds show the following:

a.      Investigators located and reviewed surveillance footage from the camera located on the Port of Friday Harbor dock. The camera was facing approximately southwest toward the intersection of Front Street and Spring Street. On April 6, 2022, at approximately 10:05 p.m., investigators observed a subject walking quickly from the area near the Cask and Schooner toward the ferry landing. The Cask and Schooner is a restaurant adjacent to the Crystal Seas Kayaking building (on the other side from Windermere) and the scene of the fire.

This video was not of a quality that allowed investigators to specifically identify the subject, because of the distance from the intersection and the dark conditions, but it did allow for continuous tracking of the subject's movements. After coming into view at 10:05 p.m., the subject appeared to walk down the stairs towards the lower deck area of Friday Harbor Ice Cream Co. at approximately 10:06 p.m. Friday Harbor Ice Cream Co. is located at 1 Front Street South in Friday Harbor, northeast of the fire scene. There are no open businesses in this lower deck area; rather, it is under the ice cream shop along the harbor.

After a short period, the subject then walked back upstairs and around the front of the ice cream business toward the ferry landing, this time pulling a rolling suitcase. (Note: Footage from the same surveillance camera earlier that same evening showed a subject consistent with the subject mentioned above bringing a rolling suitcase down the stairs to the Friday Harbor Ice Cream Co.'s lower deck area at approximately

AFFIDAVIT OF SA VOROTNIKOVA - 7
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

7:50 p.m., then walking up the stairs without the suitcase at approximately 8:10 p.m. The same subject appeared to re-enter the deck area on multiple occasions between 8:24 p.m. and 9:37 p.m., always leaving the suitcase behind.)

b.     Investigators did not locate any video that showed individuals other than this subject in the general vicinity of the Crystal Seas Kayaking building at the time the fire began, at approximately 10:04 p.m., although investigators did not locate any video that showed the building at 40 Spring Street itself.

c.     Investigators obtained photos from surveillance video from the Washington State Patrol. One of the photos depicted the passenger area of the Friday Harbor Ferry Terminal. On April 6, 2022, at approximately 10:12 p.m., a subject consistent with the subject that retrieved a suitcase walked towards the ferry's walk-on passenger loading area (*Figure 3*). The subject appeared to be coming from the direction of the Friday Harbor Ice Cream Co., and the time required to walk that short distance is consistent with the subject being the person who retrieved the suitcase. There were few passengers in the passenger ferry terminal that evening, and the subject was the only one pulling a rolling suitcase. The subject ultimately the boarded the Washington State Ferry bound for Anacortes, Washington, at 10:24 p.m. The ferry departed at 10:38 p.m. for the approximately 65-minute ride to Anacortes.

//

//

AFFIDAVIT OF SA VOROTNIKOVA - 8
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



*Figure 3*

d.      Washington State Patrol provided a photo depicting the subject walking through the passenger area of the ferry at 11:52 p.m.  (*Figure 4*). The photo was of a quality that allowed for recognition of articles of clothing and the subject's general features, but a clear shot of his face was not available. The subject appeared to be a white male with medium length dark hair. The subject was wearing a camouflage baseball cap, an olive drab T-shirt, possible camouflage pants, military-style boots, dark-colored gloves, and a dark watch on his left wrist. A large fixed-blade knife was observed in a holster on his left hip.

//

//

AFFIDAVIT OF SA VOROTNIKOVA - 9
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



***Figure 4***

      e.     At approximately 11:57 p.m., the subject disembarked the ferry upon its arrival in Anacortes. At approximately 12:04 a.m. on April 7, 2022, the subject entered a dark-colored sedan and departed the ferry lot (***Figure 5***).

//

//

AFFIDAVIT OF SA VOROTNIKOVA - 10
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23



*Figure 5*

24    18.    This subject on the ferry was ultimately identified as DWIGHT C.

25 HENLINE as discussed below. DWIGHT C. HENLINE was known to San Juan County

26 law enforcement personnel, and his actions had generated several calls for service in

27 Friday Harbor on April 6, 2022, such that sheriff's deputies and others interacted with

28 him that day before he departed Friday Harbor on the ferry.

AFFIDAVIT OF SA VOROTNIKOVA - 11
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a.      SJCSO Case # 22-2060: At approximately 3:15 p.m. on April 6, 2022, SJCSO deputies responded to a burglary in progress at Saint Francis Catholic Church, located at 425 Price Street in Friday Harbor, Washington. This church is about a half mile, 10- to 15-minute walk from the scene of the fire at 40 Spring Street. The complainant, DWIGHT C. HENLINE's former roommate E.K., told deputies he observed a subject that looked like DWIGHT C. HENLINE entering the structure. Deputies did not locate any subjects on the church's premises.

b.      SJCSO Case # 22-2066: At 5:44 p.m. on April 6, 2022, complainant J.B. identified DWIGHT C. HENLINE by name and stated DWIGHT C. HENLINE had harassed him and his girlfriend, A.C., by making veiled threats that he was going to "come after" the complainant when he least suspected it. A.C. had formerly dated DWIGHT C. HENLINE, and DWIGHT C. HENLINE was alleged to have followed her to Friday Harbor after they broke up. The complainant was advised to obtain an anti-harassment order.

c.      SJCSO Case # 22-2068: At 6:23 p.m. on April 6, 2022, a complainant asked law enforcement to trespass DWIGHT C. HENLINE, whom she identified by name, from the Presbyterian Church properties located at 395 Spring Street in Friday Harbor, Washington. The Presbyterian church is only three or four blocks and a five-minute walk from the scene of the fire at 40 Spring Street. The complainant asked that DWIGHT C. HENLINE be trespassed because of his "hostile and creepy" behavior at an Alcoholics Anonymous meeting that morning at the church. SJCSO Deputy Jay Holt located DWIGHT C. HENLINE at his van, a 1999 Mercury Villager bearing Washington license plate BLG0649. The vehicle was parked at Washington State Ferries Lot C, which is approximately three blocks from the location of the fire. Deputy Holt served DWIGHT C. HENLINE with the trespass notice at approximately 7:15 p.m. DWIGHT C. HENLINE told Deputy Holt that he was intending to leave the island the following day to return to Oak Harbor. DWIGHT C. HENLINE further told Deputy Holt

AFFIDAVIT OF SA VOROTNIKOVA - 12
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  that he had a suitcase at the church that he needed to retrieve. A bystander who had towed

2  DWIGHT C. HENLINE's vehicle to the lot advised he would retrieve the suitcase.

3      19.    In addition to the cases listed above, the SJCSO has a number of historical

4  records involving DWIGHT C. HENLINE.

5          a.    Deputy Holt arrested DWIGHT C. HENLINE after a collision on

6  July 8, 2021, because he was driving under the influence of alcohol or intoxicants.

7  Deputy Holt found that DWIGHT C. HENLINE was in possession of a firearm, which he

8  was ineligible to possess due to a previous domestic violence conviction (21-5890).

9          b.    On February 5, 2022, Deputy Holt again had contact with DWIGHT

10  C. HENLINE, this time regarding arguments he was having with his roommate, E.K. (22-

11  000822). Through that investigation, Deputy Holt learned DWIGHT C. HENLINE was

12  living with E.K. at E.K.'s residence in Friday Harbor, Washington, and that DWIGHT C.

13  HENLINE was using his van to store personal items.

14          c.    On February 22, 2022, DWIGHT C. HENLINE made a report to law

15  enforcement claiming that E.K. had committed the offense of unlawful weapons

16  possession. E.K. was subsequently arrested for unlawful possession of firearms, and

17  DWIGHT C. HENLINE moved out of E.K.'s residence. While reporting the unlawful

18  possession of firearms by E.K., DWIGHT C. HENLINE provided law enforcement with

19  his own phone number: (360) 544-2519. (Note: During the arson investigation, the

20  investigators researched phone number (360) 544-2519 and found information linking it

21  to Julie (J.) Harrop. During further research, J. Harrop was identified as DWIGHT C.

22  HENLINE's mother.)

23      20.    On April 11, 2022, ATF SA Ellen Michelin, a member of the National

24  Response Team on site to help with the investigation, interviewed Deputy Holt regarding

25  his contacts with DWIGHT C. HENLINE. Deputy Holt described the clothing worn by

26  DWIGHT C. HENLINE during the law enforcement contact on April 6, 2022, and it was

27  consistent with the photo of a subject walking though the ferry passenger area provided

28  by Washington State Patrol. ATF investigators showed Deputy Holt a still photo of the

AFFIDAVIT OF SA VOROTNIKOVA - 13
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   subject walking through the passenger area of the ferry on April 6, 2022, and he

2   positively identified DWIGHT C. HENLINE as that subject. This is the same subject

3   who walked from the area of the Cask and Schooner at 10:05 p.m., went to obtain the

4   suitcase at 10:06 p.m. at Friday Harbor Ice Cream Co., entered the ferry's passenger

5   waiting area at 10:12 p.m., and boarded the ferry at 10:24 p.m., all on April 6, 2022.

6       21.   SJCSO Detective Lukas Peter, who was working on the investigation with

7   ATF agents, separately showed the same still photo to his colleague SJCSO Deputy

8   Nawn. Deputy Nawn, who has also had prior law enforcement contact with DWIGHT C.

9   HENLINE, also positively identified DWIGHT C. HENLINE as the subject on the ferry

10  based on his prior interactions with him. Deputies Nawn and Holt were both able to

11  identify DWIGHT C. HENLINE based on his unique physical features.

12      22.   On April 11, 2022, Det. Peter interviewed A.C., DWIGHT C. HENLINE's

13  former girlfriend. A.C. said she dated DWIGHT C. HENLINE for approximately two

14  years, ending the relationship in January 2021. A.C. said she lived with DWIGHT C.

15  HENLINE on Whidbey Island, then moved back to San Juan Island after their breakup.

16  A.C. said DWIGHT C. HENLINE also moved up to San Juan Island and had been

17  behaving strangely since. A.C. reported that DWIGHT C. HENLINE's demeanor was

18  erratic; sometimes he asked to hang out with her and sometimes he threatened to kill her

19  through unspecified means. A.C. said that on or about April 6, 2022, DWIGHT C.

20  HENLINE appeared to be intoxicated in a vacant lot near Spring Street and was yelling

21  veiled threats about "getting" her and her new boyfriend. A.C. said she heard that

22  HENLINE had left the island.

23      ### *DWIGHT C. HENLINE's Activities on April 6, 2022*

24      23.   ATF agents reviewed high quality surveillance footage collected from

25  King's Market, a grocery store located at 160 Spring Street in Friday Harbor, across the

26  street from Herb's Tavern, which is one of the buildings destroyed in the fire. The video

27  depicted a subject—who was clothed similarly to the subject identified as DWIGHT C.

28  HENLINE—purchasing three items, which were later determined to be two Monster

AFFIDAVIT OF SA VOROTNIKOVA - 14
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   energy drinks and one bag of M&Ms, and paying with a card at 5:04 p.m. (Note: The

2   receipt for 5:04 p.m. purchase was subsequently located in DWIGHT C. HENLINE's

3   vehicle during the execution of a search warrant, discussed below.) The subject set the

4   purchased items, which were contained in a blue plastic bag, on the floor near the main

5   entry door and walked out of view from the camera. The subject then returned to the

6   register and purchased gallon jugs of bleach and ammonia with a card at approximately

7   5:11 p.m. on April 6, 2022 (*Figure 6*). SJCSO Deputy Brandt, who has had prior law

8   enforcement contact with DWIGHT C. HENLINE, reported that she was off duty at

9   approximately that time and observed DWIGHT C. HENLINE in the cleaning product

10   aisle.



*Figure 6*

23   24.   ATF agents also reviewed surveillance footage from the nearby Little

24   Store, located at 285 Spring Street, Friday Harbor, Washington, about two blocks from

25   the scene of the fire on the same street. The footage showed a subject purchasing an 8-

26   ounce yellow bottle of Ronsonol lighter fuel at 9:53 p.m. (i.e., eleven minutes before the

27   fire began) on April 6, 2022 (*Figures 7 and 8*). The subject paid $5.00 in cash for the

28   bottle. The subject appeared to be wearing the same clothes as the subject identified as

AFFIDAVIT OF SA VOROTNIKOVA - 15
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

DWIGHT C. HENLINE from the later ferry footage. Additionally, the subject is wearing a fixed-blade knife in a holster on his left hip and a distinctive tooth-shaped necklace; an unusual club-like object also appeared to be attached to the subject's backpack (***Figure 9***). Agents compared this footage from the Little Store with DWIGHT C. HENLINE's publicly accessible Facebook page. The distinctive tooth-shaped necklace and the club-like object are visible in both (***Figures 10 and 11***).



***Figure 7***

//

//

1
2
3
4
5
6
7
8
9
10
11
12



*Figure 8*

13
14
15
16
17
18
19
20
21
22
23
24
25



*Figure 9*

26
27
28

AFFIDAVIT OF SA VOROTNIKOVA - 17
USAO# 2022R00471



*Figure 10*



*Figure 11*

AFFIDAVIT OF SA VOROTNIKOVA - 18
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

25.     ATF agents reviewed surveillance footage from cameras placed in public areas by the Town of Friday Harbor. That footage showed DWIGHT C. HENLINE at 9:55 p.m. (i.e., two minutes after purchasing lighter fuel and nine minutes before the fire began) walking along Sunshine Alley, away from the Little Store, then walking through the alley between the Palace Theatre and the Bait Shop, both of which are located on Spring Street, approximately 450 feet southwest of the fire scene. At approximately 9:56 p.m. (three minutes after buying the lighter fuel and eight minutes before the fire began), DWIGHT C. HENLINE crossed Spring Street, passed King's Market, and continued walking in the direction of Crystal Seas Kayaking (*Figure 12*).



*Figure 12*

26.     To recap the timeline of DWIGHT C. HENLINE's movements on April 6, 2022:

AFFIDAVIT OF SA VOROTNIKOVA - 19
USAO# 2022R00471

- 5:04 p.m.: DWIGHT C. HENLINE purchased candy and energy drinks at King's Market.

- 5:11 p.m.: DWIGHT C. HENLINE purchased bleach and ammonia at King's Market.

- 7:15 p.m. (approximately): Deputy Holt served DWIGHT C. HENLINE with the trespass notice at Washington State Ferries Lot C.

- 7:50 p.m.: DWIGHT C. HENLINE walked to Friday Harbor Ice Cream Co. and went to the lower deck; he appeared to be carrying a backpack and rolling a suitcase.

- 8:10 p.m.: DWIGHT C. HENLINE walked up the stairs from the deck area without the suitcase and traveled southwest towards Cask and Schooner Public House. DWIGHT C. HENLINE appeared to be carrying a backpack.

- 8:24 p.m. to 9:37 p.m.: DWIGHT C. HENLINE made several trips to and from the Friday Harbor Ice Cream Co. lower deck.

- 9:53 p.m.: DWIGHT C. HENLINE purchased Ronsonol lighter fuel from the Little Store.

- 9:55 p.m.: DWIGHT C. HENLINE walked along Sunshine Alley, away from the Little Store, and through the alley between the Palace Theatre and the Bait Shop to Spring Street.

- 9:56 p.m.: DWIGHT C. HENLINE crossed Spring Street, passed King's Market, and continued to travel towards the area of Crystal Seas Kayaking.

- 10:04 p.m.: Windermere Real Estate surveillance footage captured a bright 30-second flash in the area of Crystal Seas Kayaking, marking the ignition of the ignitable liquid and the beginning of the fire.

- 10:05 p.m.: DWIGHT C. HENLINE walked from the corner of Cask and Schooner to the Friday Harbor Ice Cream Co. lower deck.

AFFIDAVIT OF SA VOROTNIKOVA - 20
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

- 10:06 p.m.: DWIGHT C. HENLINE obtained the suitcase from the lower deck area of Friday Harbor Ice Cream Co.
- 10:12 p.m.: DWIGHT C. HENLINE walked towards the ferry's walk-on passenger loading area.
- 10:24 p.m.: DWIGHT C. HENLINE boarded the ferry bound to Anacortes.
- 11:57 p.m.: DWIGHT C. HENLINE disembarked the ferry in Anacortes.
- 12:04 a.m.: DWIGHT C. HENLINE entered a dark-colored sedan and departed the ferry lot.

27.     Through reviewing multiple surveillance videos, investigators did not observe much foot traffic in the area of Spring Street near Crystal Springs Kayaking on April 6, 2022, especially after 9:00 p.m.

### *Vehicle Search Warrant*

28.     On April 11, 2022, after identifying DWIGHT C. HENLINE as the probable suspect, ATF SA Michelin looked for the light-green, 1999 Mercury Villager minivan with Washington license plate BLG0649, the same vehicle in which Deputy Holt contacted DWIGHT C. HENLINE on April 6, 2022. Agent Michelin found it at approximately 8:50 a.m. parked in the Friday Harbor Washington State Ferries Commuter Parking Lot C, in the area of Nichols Street East and B Street, where Deputy Holt had contacted DWIGHT C. HENLINE. Subsequent checks of Washington Department of Licensing (DOL) records showed the vehicle was registered to Dwight C. Henline.

29.     At approximately 9:12 a.m., two of the investigators assigned to this case, ATF SA Heller and SJCSO Detective Peter, went to Lot C and observed the same minivan. Agent Heller and Detective Peter looked through the vehicle's windows but did not open any doors or windows. They observed that the vehicle was packed very full of miscellaneous belongings. A black pistol holster was visible on the driver's seat near the center armrest. Due to DWIGHT C. HENLINE's conviction for Assault 4 Domestic Violence, he was not eligible to possess firearms under state law. They also saw a plastic

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

jug partially full of liquid on the driver's floorboard. No markings were visible on the container. They saw a BIC brand lighter in an open compartment on the driver's door near the window controls. SA Heller took photographs of the vehicle and the items of interest. The vehicle was subsequently impounded and secured at the SJCSO lot; it was not operable.

30.     On the same day, at approximately 10:00 p.m., agents executed a search warrant obtained from the San Juan County Superior Court on DWIGHT C. HENLINE's 1999 Mercury Villager minivan. Among other items, investigators recovered a King's Market receipt dated April 6, 2022, at 17:05:38, documenting a purchase of two energy drinks and M&Ms; multiple lighters; charcoal lighter fluid; an aluminum bat with screws attached; and gasoline samples from a gas can. (Note: The charcoal lighter fluid and the gas can were both located in the back seat under belongings and were not immediately accessible.)

### *Phone contact with DWIGHT C. HENLINE*

31.     On April 13, 2022, Agent Heller and Detective Peter contacted DWIGHT C. HENLINE's mother J. Harrop in unincorporated Island County. She confirmed (360) 544-2519 was the current cell phone number for DWIGHT C. HENLINE, and that she was his mother. She further stated DWIGHT C. HENLINE was not at her home, but was elsewhere on Whidbey Island. J. Harrop said DWIGHT C. HENLINE had called her around 7:00 p.m. on Wednesday (April 6, 2022), and she picked him up from the ferry in Anacortes. J. Harrop said DWIGHT C. HENLINE was "done" with being in Friday Harbor and was upset with his former roommate "E." J. Harrop stated that DWIGHT C. HENLINE stayed at her house located in Oak Harbor, Washington, from the time she picked him up from the ferry in the early morning hours of April 7, 2022, until April 12, 2022, when she stated she drove DWIGHT C. HENLINE to her parents' (DWIGHT C. HENLINE's grandparents') residence in Langley, Washington. A search of Washington State Driver's records showed DWIGHT C. HENLINE has a listed address in Langley, Washington. A search of Island County Assessor's records showed that that property was

AFFIDAVIT OF SA VOROTNIKOVA - 22
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   owned by William (W.) Harrop. A public records search showed W. Harrop was 80 years

2   old and a relative of J. Harrop and DWIGHT C. HENLINE. Information obtained from

3   Island County Sheriff's Office (ICSO) indicated that J. Harrop was also associated with

4   that address.

5         32.     Later, on April 13, 2022, Agent Heller and Detective Peter called DWIGHT

6   C. HENLINE on the number they obtained from SCJSO records that his mother had

7   confirmed. They advised DWIGHT C. HENLINE that their conversation was being

8   recorded. DWIGHT C. HENLINE stated that he had left Friday Harbor and was "done

9   with that place." DWIGHT C. HENLINE confirmed that he had had contact with a

10   SJCSO deputy who had served him with a trespass notice.

11         33.     DWIGHT C. HENLINE claimed that after his contact with the deputy, he

12   had played an augmented reality type game on his phone, of a type similar to the popular

13   game Pokémon Go. He said this game involved moving around and finding things.

14   DWIGHT C. HENLINE said he was in the area of the high school and a bench near Key

15   Bank and when playing the game. DWIGHT C. HENLINE said the only business he

16   entered was the Little Store. He said at the Little Store he purchased non-alcoholic drinks.

17   DWIGHT C. HENLINE denied purchasing any lighters or lighter fluid and also said he

18   did not see anyone else purchasing lighters or lighter fluid that day. DWIGHT C.

19   HENLINE said he then picked up a chicken wrap from Haley's. Haley's Sports Bar &

20   Grill is located at 175 Spring Street, Friday Harbor, Washington, and is across the street

21   and a block away the scene of the fire. DWIGHT C. HENLINE said he decided not to eat

22   in the restaurant because they appeared to be about to close. (Note: surveillance footage

23   showed DWIGHT C. HENLINE departing Haley's at approximately 9:09 p.m.)

24   DWIGHT C. HENLINE said he then walked down towards the ferry terminal. He said he

25   walked on the Haley's and Chinese pizza restaurant side of the street. (This would be the

26   southeast side of Spring Street, across the street from the scene of the fire. Although

27   earlier video showed DWIGHT C. HENLINE walking down this side of the street, the

28   video from immediately before the fire was ignited and after the fire was ignited when he

AFFIDAVIT OF SA VOROTNIKOVA - 23
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   was heading to the ferry showed him on the opposite side of the street, where Crystal

2   Seas Kayaking and the other businesses that burned were located.) DWIGHT C.

3   HENLINE said that as he walked by, he saw some people outside of Herb's Tavern. He

4   estimated this was about 9:30 p.m. DWIGHT C. HENLINE said he ate his food and had a

5   cigarette near an ice cream shop where he could watch for the ferry to arrive. DWIGHT

6   C. HENLINE said he did not walk behind any buildings or go anywhere else because he

7   was trying to catch the ferry.

8   ### ***Search of residence associated with DWIGHT C. HENLINE and recovery of the***

9   ### ***cellular phone***

10      34.     On April 14, 2022, Detective Peter obtained a real-time location warrant for

11  the cell phone with phone number (360) 544-2519. Location data obtained on April 14,

12  2022, showed cellular phone locations between Langley and Freeland, Washington, on

13  Whidbey Island. At approximately 4:30 a.m. on April 15, 2022, the data showed no

14  location, indicating the phone was off or in an area with no service. On April 15, 2022, at

15  approximately 1:13 p.m., agents began to receive location data again in 15-minute

16  intervals (sometimes called pings), as is common. The location data varied in precision

17  and did not pinpoint an exact location. However, DWIGHT C. HENLINE's

18  grandparents' address was in the area of the pings on the afternoon of April 15, 2022,

19  with a ping at 3:14 p.m. centered less than 200 feet from DWIGHT C. HENLINE's last

20  known address.

21      35.     On April 15, 2022, at approximately 5:34 p.m., SJCSO, ATF, the Island

22  County Sheriff's Office (ICSO), and Langley Police served a San Juan County Superior

23  Court search warrant on the residence in Langley, Washington, associated with DWIGHT

24  C. HENLINE and his grandparents. The occupants of the residence, William and Susan

25  Harrop, were identified as DWIGHT C. HENLINE's grandparents. W. Harrop confirmed

26  that DWIGHT C. HENLINE came to the home approximately two-and-a-half days prior

27  and had been staying exclusively in a spare bedroom in the southeast corner of the

28

AFFIDAVIT OF SA VOROTNIKOVA - 24
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  residence. W. Harrop advised HENLINE left the residence approximately thirty minutes
2  prior to the investigators' arrival.

3     36.  During the execution of the search warrant, agents found the following
4  items in the room that W. Harrop had identified as the one used by DWIGHT C.
5  HENLINE: an 8-ounce yellow Ronsonol lighter fuel container, consistent with the one
6  that DWIGHT C. HENLINE purchased from the Little Store right before the fire began,
7  that was mostly empty; several BIC lighters; clothing consistent with what was worn by
8  DWIGHT C. HENLINE in the various surveillance videos collected during the
9  investigation; and a black suitcase also consistent with what was seen in the surveillance
10  footage. Investigators also found a black cellular phone (SUBJECT DEVICE) that they
11  determined was DWIGHT C. HENLINE's and seized it pursuant to the search warrant.
12  (Note: W. Harrop confirmed the cellular phone belonged to DWIGHT C. HENLINE.)
13  The SUBJECT DEVICE was a black cellular phone, Galaxy A51 model, manufactured
14  by Samsung, IMEI: 354030116084186, in a black case.

15     37.  Following the execution of the residence search warrant, agents obtained a
16  state arrest warrant. Langley Police Department officers ultimately located and arrested
17  DWIGHT C. HENLINE in Langley on April 16, 2022.

18      ***DWIGHT C. HENLINE's Possession of SUBJECT DEVICE on April 6, 2022***

19     38.  On May 9, 2022, ATF SA/Digital Media Collection Specialist Lexie
20  Widmer examined the SUBJECT DEVICE**,** an Android smartphone, pursuant to a
21  Federal Search Warrant MJ22-203, which included the extraction of the device data. The
22  forensic examination of the SUBJECT DEVICE showed it was associated with the
23  Google account: **dwighthenline44@gmail.com** (Target Account). Based on my training
24  and experience, messages, emails, voicemails, photos, videos, documents, and internet
25  searches are often created and used in furtherance of criminal activity, including to
26  communicate and facilitate the offense under investigation.  Thus, stored communications
27  and files connected to a Target Account may provide direct evidence of the offenses

28

AFFIDAVIT OF SA VOROTNIKOVA - 25
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

under investigation.  A preservation letter for the Target Account was sent on June 10, 2022.

39.     Account activity may provide relevant location history and location reporting providing evidence of DWIGHT C. HENLINE's location before, during, and following the commission of the arson.  Such location history may result in additional witnesses to his conduct before, during, and in the days following the arson.

40.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.,* information indicating a plan to commit a crime), or consciousness of guilt (*e.g.,* deleting account information in an effort to conceal evidence from law enforcement).

41.     The extracted data showed, amongst others, photos of DWIGHT C. HENLINE taken on April 4, 2022, and a video of DWIGHT C. HENLINE taken on April 7, 2022. SUBJECT DEVICE also used phone number (360) 544-2519 with cell phone provider Verizon. As noted earlier in this affidavit, DWIGHT C. HENLINE provided law enforcement with his phone number: (360) 544-2519 on February 22, 2022. Also, J. Harrop, DWIGHT C. HENLINE's mother, confirmed (360) 544-2519 was the current cell phone number for him during her contact with law enforcement on April 13, 2022, and that he had called her on the evening of April 6, 2022. The extracted data showed incoming and outgoing call records to and from "Mom."

### *Lighter fuel*

42.     Investigators purchased Ronsonol lighter fuel from the Little Store for $4.87. They compared the Ronsonol lighter fuel container that they purchased to the Ronsonol lighter fuel container they recovered during the search warrant; the two containers appeared to be identical. During the examination of the bottle recovered from DWIGHT C. HENLINE's room, a set of printed characters were observed on the bottle: "102819621UV!" (***Figure 13***). During the examination of the bottle purchased from The

Little Store by the investigators, the same set of printed characters ("102819621UV!")
were observed on the bottom.



***Figure 13***

    43.    The Ronsonol lighter fuel bottle indicated that when new it contained 237
mL of product. Investigators measured the contents of the bottle recovered from
DWIGHT C. HENLINE's room during the search warrant. Approximately 30 mL
remained in it (***Figure 14***).

//

//

AFFIDAVIT OF SA VOROTNIKOVA - 27
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*Figure 14*

44.     Ronsonol lighter fuel is commonly used to fill refillable lighters. It is marked as being "extremely flammable." During the executions of the search warrant of the residence and DWIGHT C. HENLINE's minivan, no refillable lighters were recovered. All the lighters recovered from the vehicle and the residence were of a disposable type.

### *Witness Interviews*

45.     SA Heller interviewed an ex-roommate of DWIGHT C. HENLINE's, E.K. E.K. said he met DWIGHT C. HENLINE through Alcoholics Anonymous in the summer of 2021. He said they lived together from approximately November 2021 through February 2022. E.K. said DWIGHT C. HENLINE dated S.M. for a brief period in the fall of 2021. E.K. said S.M. broke up with DWIGHT C. HENLINE. He said this breakup caused a noticeable change in DWIGHT C. HENLINE's personality. E.K. described DWIGHT C. HENLINE after this breakup as "manic" and said DWIGHT C. HENLINE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

made statements threatening to hurt people. These statements included DWIGHT C. HENLINE discussing cutting off people's skin. E.K. said DWIGHT C. HENLINE began arming himself with knives, a club, and weapons made from animal bones. E.K. also said that discussions about A.C., a different ex-girlfriend of DWIGHT C. HENLINE's, were triggers that caused DWIGHT C. HENLINE to exhibit aggressive behavior, including swinging his club.

46.     SA Heller also interviewed S.M., who said that she had a relationship with DWIGHT C. HENLINE in the fall of 2021 but said she had not considered the two of them to be a couple. She said at some point she made that fact clear to DWIGHT C. HENLINE and ended the relationship. She said from approximately January 2022 forward she only saw DWIGHT C. HENLINE at Alcoholics Anonymous meetings. S.M. said that DWIGHT C. HENLINE never made threats directly to her but appeared to be upset with everyone. S.M. reported that she had not seen DWIGHT C. HENLINE recently and did not see him the day before the fire. S.M. reported having received some social media messages from DWIGHT C. HENLINE on approximately April 2, 2022, but ignored them and didn't open them. S.M. reported that she believed DWIGHT C. HENLINE was on Whidbey Island.

47.     S.M. reported that on April 6, 2022, (the evening before the fire) she went to Herb's Tavern to play pool. S.M. arrived between 8:30 and 9:00 p.m. and parked on the side of Spring Street, opposite of Herb's Tavern. S.M. reported she went out to her vehicle intending to leave at approximately 10:00 p.m., but discovered that her front passenger side tire was completely flat as she attempted to drive. S.M. re-parked her car directly in front of Herb's Tavern and got a ride out of the area at approximately 10:30 p.m. S.M. left her vehicle and did not get it back until after the fire.

48.     S.M. reported DWIGHT C. HENLINE would have recognized her vehicle because he had seen her driving it and had ridden in it before. S.M. reported having replaced the damaged tire but she kept the flat tire. SA Heller and a SJCSO detective arranged to meet with S.M. and inspect the tire. Upon inspection, SA Heller and the

AFFIDAVIT OF SA VOROTNIKOVA - 29
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  SJCSO detective observed a cut in the sidewall of the tire that extended all the way

2  through the rubber to the inside of the tire.

3  *Activities affecting interstate commerce*

4  49.     The primary buildings and businesses damaged or destroyed in the fire in

5  Friday Harbor, Washington were:

6  • 40 Spring Street: Crystal Seas Kayaking, San Juan Property Management, and

7  San Juan Excursions

8  • 50 Spring Street: Windemere Real Estate

9  • 70 Spring Street: Crow's Nest Coffee

10  • 80 First Street South: Herb's Tavern

11  50.     Fire investigators determined that the fire started in the decked area

12  attached to 40 Spring Street. Investigators interviewed the owners of that building and the

13  businesses that are based in it.

14  51.     Crystal Seas Kayaking offers sea kayaking trips and bicycle tours in the

15  San Juan Islands. Friday Harbor and San Juan Island generally are tourist destinations,

16  and tourism is a major business in the town and region. The owners of Crystal Sea

17  Kayaking explained that it is common for individuals who reside outside of the state of

18  Washington and even outside of the United States to travel to Friday Harbor and take

19  their biking or kayaking tours. The owners are aware of the states and countries of

20  residence of their guests from having conversations with them, as well as from reviewing

21  addresses the guests listed on waiver forms. Crystal Seas Kayaking maintains a website

22  that it uses for advertising and booking, uses Google advertisements, and offers remote

23  tour bookings via the phone and internet. Crystal Seas Kayaking accepts major credit

24  cards via the credit card processing company Heartland. From prior experience serving

25  court orders and from open-source research, I am aware that Google is headquartered in

26  California and Heartland is headquartered in Oklahoma.

27  52.     San Juan Excursions offers wildlife and whale watching tours. Like Crystal

28  Seas Kayaking, the owners are aware that guests travel from out of the state and out of

AFFIDAVIT OF SA VOROTNIKOVA - 30
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  the country. Again, this knowledge comes from conversations with the guests and from
2  reviewing addresses the guests listed on waiver forms. San Juan Excursions also offers
3  remote tour bookings via phone and internet and accepts credit card payments via credit
4  card processor Heartland.

5       53.    San Juan Property Management manages vacation rentals on San Juan
6  Island and Orcas Island. As with the other two above businesses, the owners are aware
7  that it is common for individuals who reside outside of the State of Washington,
8  including outside of the United States, to travel the San Juan Islands and stay in managed
9  vacation rentals. This knowledge comes from conversations with guests as well as from
10 reviewing booking information. San Juan Property Management books rental units
11 through its own website, through VRBO, and through AirBnB. Credit cards are accepted
12 through either VRBO, Air BnB, or the credit card processor Vacation Rent Payment.
13 Open-source research indicates that VRBO is headquartered in Texas, and Airbnb and
14 Vacation Rent Payment are headquartered in California.

15      54.    Also, Windermere Real Estate manages vacation rentals, in addition to
16 selling real property. Crow's Nest Coffee and Herb's Tavern are restaurants.

17 **<u>BACKGROUND OF GOOGLE SERVICES</u>**

18     In my training and experience, I have learned that Google provides a wide variety
19 of on-line services, including electronic mail ("e-mail") access and instant messaging
20 (otherwise known as "chat" messaging), to the general public.  Google provides
21 subscribers e-mail and chat accounts at the domain name "@gmail.com."  Google also
22 allows subscribers to register a custom domain name and set up Google services such as
23 chat and e-mail using that domain name instead of "@gmail.com."  Google also hosts
24 domains and provides a multitude of services that can be linked and managed through a
25 common account.

26 **A.    Subscriber Records and Account Content**

27     Subscribers obtain an account by registering with Google.  When doing so, e-mail
28 providers like Google ask the subscriber to provide certain personal identifying

AFFIDAVIT OF SA VOROTNIKOVA - 31
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

information.  This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users, and to help establish who has dominion and control over the account.

E-mail providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's websites), and other log files that reflect usage of the account.  In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

In some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation, because the information can be used to identify the account's user or users.

In general, an e-mail that is sent to a Google subscriber is stored in the subscriber's "mailbox" on Google's servers until the subscriber deletes the e-mail.  When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the

AFFIDAVIT OF SA VOROTNIKOVA - 32
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Internet to Google servers, and then transmitted to its end destination.  Google often

2  maintains a copy of received and sent e-mails.  Unless the sender specifically deletes an

3  e-mail from the Google server, the e-mail can remain on the system indefinitely.  Even if

4  the subscriber deletes the e-mail, it may continue to be available on Google's servers for

5  some period of time.

6      A sent or received e-mail typically includes the content of the message, source and

7  destination addresses, the date and time at which the e-mail was sent, and the size and

8  length of the e-mail.  If an e-mail user writes a draft message but does not send it, that

9  message may also be saved by Google but may not include all of these categories of data.

10     In addition to e-mail and chat, scribers numerous other services including:

11  Android, Blogger, Google Alerts, Google Calendar, Google Chrome Sync, Google Cloud

12  Print, G-Suite, Google Developers Console, Google Drive, Google Hangouts, Google

13  Maps, Google Payments, Google Photos, Google Search Console, Google Voice,

14  Google+, Google Profile, Location History, Web & Activity, and YouTube, among

15  others.  Among other things, Google Search Console records a Google account user's

16  search queries.  Google Web & Activity records certain browsing history depending on

17  whether the account holder is logged into their account.  Like many internet service

18  companies, the services Google offers are constantly changing and evolving.

19     Search and browsing history can also be extremely useful in identifying those

20  using anonymous online accounts and may also constitute direct evidence of the crime

21  under investigation to the extent the browsing history or search history might include

22  searches and browsing history related to arson, ignitable materials, and other evidence of

23  the crime under investigation and confirm the identity and location of the account user.

24  **B.     Google Location History and Location Reporting**

25     According to Google's website, "Location Reporting" allows Google to

26  periodically store and use a device's most recent location data in connection with the

27  Google Account connected to the device.  "Location History" allows Google to store a

28  history of location data from all devices where a user is logged into their Google Account

AFFIDAVIT OF SA VOROTNIKOVA - 33
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and has enabled Location Reporting.  According to Google "when you turn on Location Reporting for a device like your iPhone or iPad, it lets Google periodically store and use that device's most recent location data in connection with your Google Account."  How often Location Reporting updates location data is not fixed.  Frequency is determined by factors such as how much battery life the device has, if the device is moving, or how fast the device is moving.  Google's location services may use GPS, Wi-Fi hotspots, and cellular network towers to determine an account holder's location.

Based on the above, I know that if a user of a Target Account utilizes a mobile device to access the respective account identified in Attachment A and has not disabled location services on his device/s or through the Google account settings, Google may have detailed records of the locations at which the account holders utilized the mobile device/s.  This type of evidence may further assist in identifying the account holder and lead to the discovery of other evidence of the crime under investigation.

I know that Google's Android service collects and stores identifying information about an Android smart phone used to access the Google account, including the International Mobile Equipment Identifier (IMEI), International Mobile Subscriber Identity (IMSI), telephone number and mobile carrier code.  I know that Google's Location History service periodically queries the physical location of a device that is currently accessing a Google account through the device's GPS, nearby Wi-Fi network IDs and cellular tower information and records a history of device movements in Google's servers.

Google is also able to provide information that will assist law enforcement in identifying other accounts associated with the Target Account.  In particular, Provider can provide information identifying and relating to other accounts used by the same subscriber.  This information includes any forwarding or fetching accounts[1] related to the

---

[1] A forwarding or fetching account related to one of subject accounts would be a separate email account that can be setup by the user to receive copies of all of the email sent to the subject account.

AFFIDAVIT OF SA VOROTNIKOVA - 34
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Target Account; all other accounts linked to the Target Account because they were

2  accessed from the same computer (referred to as "cookie overlap"); all other accounts

3  that list the same SMS phone number as the Target Account; all other accounts that list

4  the same recovery email addresses as the Target Account; and all other accounts that

5  share the same creation IP addresses as the Target Account. This information will assist

6  law information in determine who controls the Target Account and in identifying other

7  accounts utilized by the malware scheme.

8  **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

9  I anticipate executing this warrant under the Electronic Communications Privacy

10  Act (ECPA), in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by

11  using the warrant to require Provider to disclose to the government copies of the records

12  and other information (including the content of communications) particularly described in

13  Section I of Attachment B. Upon receipt of the information described in Section I of

14  Attachment B, government-authorized persons will review that information to locate the

15  items described in Section II of Attachment B.

16  Pursuant to Title 18, United States Code, Section 2703(g), this application and

17  affidavit for a search warrant seeks authorization to permit Provider, and its agents and

18  employees, to assist agents in the execution of this warrant. Once issued, the search

19  warrant will be presented to Provider with direction that it identify the account described

20  in Attachment A to this affidavit, as well as other subscriber and log records associated

21  with the accounts, as set forth in Section I of Attachment B to this affidavit.

22  The search warrant will direct Provider to create an exact copy of the specified

23  server, account and records.

24  I, and/or other law enforcement personnel will thereafter review the copy of the

25  electronically stored data, and identify from among that content those items that come

26  within the items identified in Section II to Attachment B, for seizure.

27  Analyzing the data contained in the copy of the specified account may require

28  special technical skills, equipment, and software. It could also be very time-consuming.

Searching by keywords, for example, can yield thousands of "hits," each of which must then be reviewed in context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant "hit" does not end the review process. Keywords used originally need to be modified continuously, based on interim results. Certain file formats, moreover, do not lend themselves to keyword searches, as keywords, search text, and many common e-mail, database and spreadsheet applications do not store data as searchable text.  The data may be saved, instead, in proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases, as well.   Consistent with the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months.  All forensic analysis of the data will employ only those search protocols and methodologies reasonably designed to identify and seize the items identified in Section II of Attachment B to the warrant.

## CONCLUSION

55.     Based on the forgoing, I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that - has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). ). Pursuant to 18 U.S.C. § 2703(g), the government will execute this warrant by serving the warrant on the Provider.  Because the warrant will be served on the Provider, who will then compile the requested records and data, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.  Accordingly, by this Affidavit and Warrant, I seek authority for the government to search all of the items specified in Section I, Attachment B (attached hereto and incorporated by reference herein) to the Warrant, and specifically to seize all of the data, documents and records that are identified in Section II to that same Attachment.

AFFIDAVIT OF SA VOROTNIKOVA - 36
USAO# 2022R00471

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      56.    The affidavit and application are being presented by reliable electronic

2  means pursuant to Federal Rules of Criminal Procedure 4.1 and 41(d)(3).

3

NATALIA VOROTNIKOVA   Digitally signed by NATALIA VOROTNIKOVA
Date: 2022.06.15 13:35:46 -07'00'

4     _____

5     Natalia Vorotnikova, Special Agent
      Special Agent

6     Bureau of Alcohol, Tobacco, Firearms
      and Explosives

7

8

9

10      The above-named agent provided a sworn statement to the truth of the foregoing

11  affidavit by telephone on this _16_ day of June, 2022.

12

13

14     _____

15     Brian A. Tsuchida

16     ~~Chief~~ United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# ATTACHMENT A

## Account to be Searched

The electronically stored data, information and communications contained in, related to, and associated with, including all preserved data (including, but not limited to, the preservation requests referenced below) associated with the following account(s):

- **dwighthenline44@gmail.com**

("Target Account"), as well as all other subscriber and log records associated with each account, which are located at premises owned, maintained, controlled or operated by Google LLC ("Google" or "Provider"), an electronic communications and online service provider headquartered at 600 Amphitheatre Parkway, Mountain View, California.

**Google Reference #19817576**

Attachment A1
USAO# 2020R00440

## ATTACHMENT B

### Items to be Seized

**I. Section I - Information to be disclosed by Google, for search:**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, including any e-mails, records, files, logs, or information that has been deleted but is still available to Google, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), including **Google Reference #19817576**, Google is required to disclose the following information to the government for each account or identifier listed in Attachment A:

(a)   The contents of all emails associated with the account from **April 1, 2022 to April 15, 2022,** including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

(b)   All subscriber records associated with the specified account, including 1) names, email addresses, and screen names; 2) physical addresses; 3) records of session times and durations; 4) length of service (including start date), account status, and types of services utilized; 5) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address such as internet protocol address, media access card addresses, or any other unique device identifiers in relation to the account; 6) account log files (login IP address, account activation IP address, and IP address history); 7) detailed billing records/logs; 8) means and source of payment; and 9) language settings;

(c)   Google Search Console content and search history;

(d)   Google Web & Activity content and web browsing history;

Attachment B - Page 1
USAO# 2020R00440

(e)     Google Location History content and other location data, including GPS, Wi-Fi, or cell tower proximity records;

(f)     Contact lists, buddy lists, and address books;

(g)     Google Voice content, including any stored voicemails and messages;

(h)     Google Chrome Sync content;

(i)     Google Chat/Messenger information and/or records, including any contact or friend list, time, date, and IP address logs for Chat and Messenger use, and any archived web messenger communications stored on servers;

(j)     Google Drive content (including backups of any apps);

(k)     Google Calendar content;

(l)     Google Maps content;

(m)    Google Photos content;

(n)     Google Hangouts content;

(o)     Google Developer Console content;

(p)     Google Docs content;

(q)     Google Domains records, including records related to any registered or hosted domains;

(r)     All privacy and account settings;

(s)     Records of all changes to the account information and account settings;

(t)     All logs records of account activity related to the account;

(u)     All information about connections between the account and third-party websites and applications;

(v)     All records pertaining to communications between your entity and the account holder (or a representative thereof) regarding the account, including contacts with support services, and all records of actions taken, including suspensions of the account;

(w)    All complaints and records relating to any adverse action taken on the account, including an account suspension for violations of terms of service,

Attachment B - Page 2
USAO# 2020R00440

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

whether temporary or permanent, the details surrounding that adverse

action, and any communications related thereto;

(x)     List of linked accounts (collectively the "Linked Subject Accounts") based

on the following:

i.      a list of all other accounts linked to each Target Account because of

cookie overlap with a Target Account;

ii.     a list of all other accounts that list the same SMS phone number as

each Target Account;

iii.    a list of all other accounts that list the same recovery email address

as each Target Account; and,

iv.     a list of all other accounts that shared the same creation IP address as

each Target Account within 30 days of creation;

(y)     Subscriber records for each of the Linked Subject Accounts (non-content)

including 1) names, email addresses, and screen names; 2) physical

addresses; 3) records of session times and durations; 4) length of service

(including start date) and types of services utilized; 5) telephone or

instrument number or other subscriber number or identity, including any

temporarily assigned network address such as internet protocol address,

media access card addresses, or any other unique device identifiers

recorded by Provider in relation to the account; 6) account log files (login

IP address, account activation IP address, and IP address history); 7)

detailed billing records/logs; 8) means and source of payment; and 9)

language settings.

**Provider is hereby ordered to disclose the above information to the government**

**within <u>14 DAYS</u> of receipt of service of this warrant.**

//

Attachment B - Page 3
USAO# 2020R00440

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

## II.  Section II - Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of Title 18, United States Code, Section 884(i) (Arson), those violations occurring between at least April 1, 2022, through April 15, 2022, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a)     Evidence of any attempt or plan to engage in arson or to otherwise cause damage to property located in Friday Harbor, San Juan County;

(b)     Evidence of any attempt or plan to target particular victims or particular businesses or locations to include underlying motivation(s) to attempt to plan to target particular victims or particular businesses or locations;

(c)     Evidence of the identity of the user(s) of the account;

(d)     Evidence of the location or whereabouts, both current and historical, of the user(s) of the account;

(e)     Evidence indicating the account user's state of mind as it relates to the crime under investigation;

(f)     Evidence of the account user's ownership, control, or use of particular email, social media, or online accounts;

(g)     All messages, documents, and profile information, attachments, or other data that serves to identify any persons who use or access the account specified, or who exercise in any way any dominion or control over the specified account;

(h)     Any address lists or buddy/contact lists associated with the specified account, and other information regarding potential co-conspirators, criminal

Attachment B - Page 4
USAO# 2020R00440

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

associates, or suspected victims or targets (i.e., attempted victims) of the arson;

(i)    All subscriber records associated with the specified account, including name, address, local and long distance telephone connection records, or records of session times and durations, length of service (including start date) and types of service utilized, telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address, and means and source of payment for such service) including any credit card or bank account number;

(j)    Any and all other log records, including IP address captures, associated with the specified account;

(k)    Any records of communications between Provider, and any person about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users about the specified account.  This to include records of contacts between the subscriber and the provider's support services, as well as records of any actions taken by the provider or subscriber as a result of the communications;

(l)    Any complaints and records relating to any adverse action taken on the account, including an account suspension for violations of terms of service, whether temporary or permanent, the details surrounding that adverse action, and any communications related thereto.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this

electronic data may be conducted by any government personnel assisting in the

investigation, who may include, in addition to law enforcement officers and agents,

attorneys for the government, attorney support staff, and technical experts.  Pursuant to

this warrant, the ATF may deliver a complete copy of the disclosed electronic data to the

custody and control of attorneys for the government and their support staff for their

independent review.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("Provider"), and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Provider.  The attached records consist of

_____

**[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Provider**,** and they were made by Provider as a regular practice; and

b.     such records were generated by Provider**'s** electronic process or system that produces an accurate result, to wit:

1.     the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Provider in a manner to ensure that they are true duplicates of the original records; and

2.     the process or system is regularly verified by Provider, and at all times pertinent to the records certified here the process and system functioned properly and normally.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1       I further state that this certification is intended to satisfy Rules 902(11) and

2  902(13) of the Federal Rules of Evidence.

3

4

5

  _____   _____

6  Date                   Signature

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970